

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 15, 2016 Session

## STATE OF TENNESSEE v. TONY EDWARD BIGOMS

**Appeal from the Criminal Court for Hamilton County**
**No. 286393      Barry A. Steelman, Judge**

---

**No. E2015-02475-CCA-R3-CD**

---

Following a jury trial, the Defendant, Tony Edward Bigoms, was convicted of premeditated first degree murder and abuse of a corpse, a Class E felony. See Tenn. Code Ann. §§ 39-13-202, -17-312(a). The trial court imposed a total effective sentence of imprisonment for life plus four years. On appeal, the Defendant contends (1) that jury separations occurred when the sequestered jury members were allowed to go to their individual homes, unsupervised, to pack their belongings at the start of the trial, were allowed to make phone calls to family members during the trial, and were allowed to visit with family members the day before the trial concluded; (2) that the trial court erred in admitting testimony from a Tennessee Bureau of Investigation (TBI) special agent regarding that agent's testimony during a previous murder trial at which the Defendant was acquitted; (3) that the trial court erred in admitting evidence found as a result of a warrantless search of the Defendant's cell phone; (4) that the State failed to prove venue by a preponderance of the evidence; and (5) that the evidence was insufficient to sustain the Defendant's convictions.[1] Following our review, we conclude that jury separations occurred when the jurors were allowed to go home unsupervised and to make phone calls during the trial. Furthermore, we conclude that the State failed to meet its burden to show that no prejudice to the Defendant occurred during these separations. Additionally, we conclude that the admission of the TBI agent's testimony regarding the Defendant's previous murder trial violated Tennessee Rule of Evidence 404(b)'s prohibition against evidence of other bad acts and that this error was not harmless. Finally, we conclude that the trial court erred in admitting the evidence found on the Defendant's cell phone as that evidence was not relevant. Accordingly, we reverse the judgments of the trial court and remand the case for a new trial. With respect to the Defendant's remaining issues, we will address those issues so as not to pretermit them. See State v. Parris, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007) (following a similar procedure).

---

[1] For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his appellate brief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court. ROBERT H. MONTGOMERY, JR., J., filed a separate concurring opinion in which TIMOTHY L. EASTER, J., joined.

Steven E. Smith, District Public Defender; Steve Brown (at trial); Jane J. Buffaloe (at trial); and Jay Underwood (at motion for new trial hearing and on appeal), Assistant District Public Defenders, for the appellant, Tony Edward Bigoms.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; M. Neal Pinkston, District Attorney General; Lance Pope and Cameron B. Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND[2]

#### I. The Victim's Disappearance

The victim, Dana Wilkes, was a "patient care technician" at Dialysis Clinic, Incorporated in Chattanooga. On November 9, 2012, the victim received her paycheck and worked a normal shift, leaving the clinic at 4:55 p.m. At approximately 7:20 p.m., the victim pulled into the parking lot of a Family Dollar to meet the Defendant. The Defendant got into the victim's green Jeep and, after a few minutes, they drove away. The Defendant and the victim then went to a local Walmart. The victim purchased some items and withdrew $240 from an ATM inside the Walmart. The Defendant and the victim left the Walmart at approximately 8:50 p.m. They then went to a nearby Murphy gas station. The Defendant pumped gas while the victim went inside and purchased some items, including a pack of cigarettes for the Defendant. The Defendant and the victim drove away from the gas station shortly after 9:00 p.m.

The victim was scheduled to be at work by 5:30 a.m. on November 10, 2012. She never arrived at the clinic. The victim's supervisor, Leslie Brown, thought it was unusual that the victim did not show up or call. Ms. Brown repeatedly tried calling the victim that morning, but the victim did not answer. Ms. Brown grew concerned and she and another staff member drove to the victim's home. Ms. Brown noticed that the victim's Jeep was not parked outside of the home, but she did not go to the front door. Ms. Brown returned

---

[2] This section contains only the facts regarding the Defendant's convictions. The factual background of the Defendant's procedural issues will be addressed later in this opinion.

to the clinic. Around noon, she received a phone call from the victim's mother who was concerned about the victim. One of the victim's co-workers, Zeddie Pryor, saw the victim's Jeep on the side of the road near the Wilcox Boulevard Tunnel around 11:00 a.m. Ms. Pryor did not know that the victim was missing when she saw the Jeep. Later in the day, another co-worker informed her about the victim's disappearance and Ms. Pryor told the co-worker that she had seen the victim's Jeep that morning. A United States Postal Service employee also saw the victim's Jeep around 2:00 p.m. that afternoon.

The victim's mother called the victim's son, Robert Preston Boulware, around noon on November 10, 2012, to tell him that she was concerned because the victim was not answering her telephone. Mr. Boulware tried calling the victim himself, and when he received no answer, he went to the victim's home. Mr. Boulware also noticed that the victim's car was not parked outside her home. Mr. Boulware found the front door unlocked. Mr. Boulware went inside the home. The victim's purse and keys were missing, but Mr. Boulware found the victim's insulin in the refrigerator. Mr. Boulware explained that the victim was diabetic and that she "always carried [insulin] in her purse" when she went out.

At this point, Mr. Boulware was concerned enough to call the police and file a "missing person" report. Officer Charles Decker of the Chattanooga Police Department (CPD) responded to Mr. Boulware's call around 4:00 p.m. Officer Decker spoke to Mr. Boulware in front of the victim's home, and Mr. Boulware told him that the victim "was [a] severe diabetic," that she "was last seen the night prior at approximately 10 p.m.," and that her not showing up for work or answering her telephone "was abnormal." Mr. Boulware recalled telling Officer Decker that the victim's mother had last spoken to the victim the night before.

After speaking to Officer Decker, Mr. Boulware went back to his home. Around 6:00 or 7:00 p.m., he received a phone call from one of the victim's co-workers. Mr. Boulware was told that the victim's Jeep had been seen near the Wilcox Boulevard Tunnel. Mr. Boulware and his roommate went to check on the Jeep. The Jeep was unlocked and Mr. Boulware looked inside. On the driver's side, Mr. Boulware found the seat moved as close as possible to the steering wheel and a pillow in the seat. Mr. Boulware explained that the victim drove that way because she was very short. Mr. Boulware did not see the victim's keys or purse in the car. Mr. Boulware saw "blood that was kind of dripping down" the glove compartment when he looked at the passenger side. Upon seeing the blood, Mr. Boulware called Officer Decker.

Officer Decker found Mr. Boulware waiting on him next to the victim's Jeep parked on the side of the road heading into the Wilcox Boulevard Tunnel. Officer Decker did not notice any blood in the area around the Jeep or on the outside of the

vehicle. Officer Decker did observe "what looked to be blood spatter on the front passenger side of the vehicle." CPD Detective Reginald Parks was called to the scene when blood was found inside the victim's Jeep. Det. Parks arrived around 7:00 p.m. and walked around the Jeep looking for blood or other evidence. Det. Parks found nothing outside the Jeep. Inside the Jeep, Det. Parks saw "a noticeable amount" of what appeared to be dried blood. Det. Parks noted that the majority of the blood was located in the area of the front passenger seat. Det. Parks recalled that there were blood "smears on the dash board" and "some kind of spray of blood on the dash" and steering wheel. Det. Parks also noticed blood "on the console in between the seats" and more "smears of blood in the back seat and some on the doors on the passenger side."

After the Jeep was discovered, Mr. Boulware and a CPD officer went back to the victim's home. While there, one of the victim's neighbors approached Mr. Boulware, said that he had the Defendant on the telephone, and that Mr. Boulware should speak to the Defendant because the Defendant had seen the victim the day before. Mr. Boulware told the Defendant that the victim was missing, and the Defendant responded that he had gone to Walmart with the victim the night before "to get stuff for a toilet." Mr. Boulware told the Defendant that they had found the victim's Jeep, but he did not recall telling the Defendant about the blood found inside the vehicle. Mr. Boulware asked the Defendant to call if he heard anything about the victim. The next day, November 11, 2012, the Defendant called Mr. Boulware around noon. The Defendant asked Mr. Boulware if he had heard from the victim and about what the police had said the night before about their investigation.

On November 11, 2012, Det. Parks went to the Hamilton County jail to speak to the victim's husband, Tom Wilkes. Mr. Wilkes was a former patient at the clinic where the victim worked. He and the victim had been married for about a year prior to the victim's disappearance. At the time of the victim's disappearance, Mr. Wilkes had been incarcerated for approximately a week on a charge of driving while his license was revoked. Several of the victim's co-workers recalled having seen the Defendant at the clinic either with Mr. Wilkes or introduced to them by the victim as Mr. Wilkes's cousin. Mr. Wilkes died not long after the victim's disappearance.

Based on his conversation with Mr. Wilkes, Det. Parks decided to speak to the Defendant. The Defendant told Det. Parks that he knew the victim and had spoken to her at Walmart on November 9, 2012. The Defendant also said that "he may have gotten a ride home" from the victim. The Defendant could not recall what the victim was wearing that night. The Defendant told Det. Parks that the victim had "said something about going to sell some pills," but he could not provide any details about the alleged drug deal. Det. Parks told the Defendant that the victim's Jeep had been found, but he could not recall if he told the Defendant that blood had been found inside the vehicle. Det. Parks

also did not recall any injuries on the Defendant "that jumped out at [him]" when he spoke to the Defendant on November 11th.

## II. The Police Investigation of the Defendant

On November 12, 2012, Det. Parks decided to conduct a formal interview with the Defendant because "[h]is name came back up from a friend" of the victim's, Stephanie Coleman. Ms. Coleman "was extremely agitated about the conversation that she had supposedly had with" the Defendant. However, Ms. Coleman initially declined to be formally interviewed by Det. Parks because she was intoxicated when they spoke. The Defendant, however, did not object to the formal interview, and Det. Parks recalled that the Defendant seemed calm during the interview. The interview lasted for approximately forty-five minutes and was recorded. The recording of the interview was played for the jury at trial.

During the interview, the Defendant told Det. Parks that the victim had been "acting her normal self" on November 9, 2012. The Defendant stated that the victim had called him after she had spoken to Mr. Wilkes that day and told him that she was having trouble with her sink. According to the Defendant, the victim met him at the Family Dollar, and they went to Walmart to look for the part he would need to fix it. The Defendant explained that the victim did not "know exactly where" he lived, so she arranged to meet him at the Family Dollar. The Defendant estimated that he met the victim around 6:00 p.m. The Defendant said that he got separated from the victim while they were inside the Walmart and that they had to call each other to find one another.

The Defendant told Det. Parks that after they finished shopping at Walmart, he and the victim went to the Murphy gas station. The Defendant initially claimed that, after getting gas, the victim dropped him off at his girlfriend's apartment. Later in the interview, the Defendant said that the victim dropped him off back at the Family Dollar and that he walked back to his girlfriend's apartment. The Defendant told Det. Parks that he could not recall when the victim dropped him off or what she was wearing that night. The Defendant stated that he assumed the victim went home to put away the items she had purchased at Walmart and that he felt confident about that assumption because he had heard that those items were not found in her Jeep. The Defendant also said that he had not heard from the victim since that night.

The Defendant claimed that while he was with the victim, she said that she was "supposed to been [sic] meeting somebody to sell some pills" and that "[s]he was waiting on the call or whatever." The Defendant told Det. Parks that the victim was supposed to have met earlier that day with someone named Chris who wanted to buy some pills, but that Chris never showed up. The Defendant also thought that the victim was going to meet "another guy," but he did not know that man's name. The Defendant explained that

Mr. Wilkes sold pills and that the victim would drive him to make the sales. The Defendant said that he had seen Chris at the victim's house before and also mentioned that one of Mr. Wilkes's regular customers was called Skip. The Defendant told Det. Parks that the victim had both her and Mr. Wilkes's cell phones with her that night. The Defendant denied that he had ever sold drugs for Mr. Wilkes and claimed that the victim did not deliver any drugs while he was with her.

The Defendant admitted that he had been to the victim's home two or three times since Mr. Wilkes had been arrested. The Defendant denied that he was staying with the victim and had a key to her home. The Defendant also denied having a romantic relationship with the victim. The Defendant told Det. Parks that he was staying with his girlfriend and "trying to manage" his aunt's house since his aunt had been hospitalized. The Defendant also told Det. Parks that "some dude name[d] J.C. was calling" the victim and trying to convince her to move in with him while Mr. Wilkes was incarcerated.

The Defendant said that someone named Pat had told him the victim's Jeep had been found. The Defendant sent Pat a text message that said the police "found a little blood over there on the passenger side." The Defendant told Det. Parks that he did not know how the blood got in the Jeep and that the victim was not bleeding when he was with her. One of the investigators in the room with Det. Parks told the Defendant that they had only found a "small" amount of blood, like if a "finger was bleeding." The Defendant said that he "didn't know how much blood" was found just that he was told there was "some blood over there." The Defendant told Det. Parks that the victim would not let anyone drive her Jeep. However, the Defendant admitted that he had driven the Jeep when the victim first purchased it. The Defendant claimed that after he learned of the victim's disappearance, he drove around the neighborhood of his aunt's house looking for the victim because it was near where the victim's Jeep was found, but he never found any trace of her.

After interviewing the Defendant, the police continued their investigation into the victim's disappearance. On November 13, 2012, the victim's home was searched. Some of the items the victim had purchased at Walmart on November 9th were found in her home. The toilet appeared to be broken and was running when the investigators searched the home. In the victim's closet, the investigators found a beige bag with several pill bottles inside. More pill bottles were found on the bottom of the victim's nightstand. A yellow bag containing still more pill bottles was found beneath the victim's bed. Among the pill bottles was a bottle of methadone prescribed to Mr. Wilkes. None of the pill bottles found in the home were linked to the Defendant.

On November 16, 2012, the investigators executed search warrants for the apartment the Defendant shared with his girlfriend and the Defendant's aunt's house. The Defendant and his girlfriend were present for the search of their apartment. Det.

Parks testified that the Defendant "was fine" during the search. Det. Parks described the apartment as being "very clean" at the time of the search. During the search, a pair of shoes that smelled heavily of bleach was seized from the apartment's laundry room along with a blue bucket. There were no laces and no inserts in the shoes when they were seized. Several other items were seized from the apartment and the Defendant's aunt's house, but subsequent forensic testing by the Tennessee Bureau of Investigation (TBI) revealed no physical connection between the seized items and the victim's disappearance. Det. Parks testified that he "noticed what appeared to be some abrasions on the back of [the Defendant's] hands" that day.

After concluding the searches, Det. Parks and Sergeant Jayevan Montgomery, a homicide investigator, conducted a second interview of the Defendant. This interview was recorded and lasted several hours. The recording of this interview was played for the jury. The interview began with the Defendant's estimating that the victim dropped him off at the Family Dollar after they got gas at the Murphy gas station, around 6:30 or 7:00 p.m. The Defendant could not remember in which direction the victim drove away. The Defendant claimed that he then walked to his car and drove to his aunt's house.

The Defendant denied that he spent the night at his aunt's house and claimed to have stayed there three hours. The Defendant told Det. Parks that he left his aunt's house to go back to his apartment around 10:30 or 11:00 p.m. The Defendant said that, once he got to the apartment, he took a shower, went to bed, and did not wake up until the morning. The Defendant initially denied going back out that night or calling anyone. The Defendant told the investigators that he may have called the victim to see if she had spoken to Mr. Wilkes while he was driving from his aunt's house to his apartment but that she did not answer. The Defendant further said that he did not believe that he had called the victim after that.

The Defendant told the investigators that the victim had said that two different people were going to come by her home to buy pills. The Defendant explained that Mr. Wilkes and the victim sold pain pills. According to the Defendant, Mr. Wilkes did most of the selling, but the victim was trying to keep the business going while Mr. Wilkes was incarcerated. Despite this, the Defendant assured the investigators that the victim did not abuse pills or other types of drugs. The Defendant said that he was good friends with Mr. Wilkes but claimed that he did not know the victim that well.

The Defendant said that he was unsure of where he went the day after he saw the victim. The Defendant believed that he had picked up his cousin and then gone to his cousin's house to watch football and drink. The Defendant did not know what time it was when he got home that day but told the investigators that Pat had called to tell him about the victim's disappearance while he was on his way home. The Defendant also told the investigators that someone named Patrick had called him and "told [him] they

-7-

found the [victim's] body" and then called him later to tell him "that they found her with a slight heartbeat." The Defendant said that Patrick's girlfriend worked with the victim.

The investigators asked the Defendant about his conversation with Ms. Coleman. The Defendant said that he and Ms. Coleman had been romantically involved in the past and that she called him wanting to "hang[] out and everything." The Defendant explained that Ms. Coleman wanted to get some cocaine and that he had told her that they could go to his aunt's house and "chill out." It was during this conversation that the Defendant told Ms. Coleman that the victim was missing. The investigators asked the Defendant if he told Ms. Coleman about blood having been found inside the Jeep. The Defendant replied as follows: "No, I told her that they found some, you know, like you told me, a little blood on the passenger side of the car. They found it on Wilcox without keys in it." The Defendant denied that he told Ms. Coleman that he got out of the victim's Jeep around 10:00 p.m. and that "blood was on somebody's hands."

The investigators confronted the Defendant about the fact that the surveillance video from the gas station showed that he and the victim were there at 9:00 p.m. The Defendant responded that he did not think he was out that late. However, the Defendant was sure that he called the victim around 10:00 p.m. to see if she had talked to Mr. Wilkes. Det. Parks told the Defendant that the victim's neighbors heard someone leave the victim's home around 10:00 p.m. The Defendant denied going to the victim's home that night. The investigators also confronted the Defendant about the fact that his girlfriend claimed that the Defendant would take her car out at night after she had taken her nightly sleeping pill. The Defendant admitted to sometimes doing that and stated that he did not know if his girlfriend was asleep when he got home on November 9th.

The investigators also confronted the Defendant with the fact that he called the victim's cell phone at 2:30 a.m. The Defendant said that he did not remember calling her and that he did not talk to her. The Defendant claimed that he "must have hit it by accident." The Defendant told the investigators that he was home at 2:30 a.m. The investigators then confronted the Defendant with the fact that during this call, his cell phone connected to a cell tower that did not cover the area of his apartment. The Defendant claimed that he must have been on his way home from his aunt's house at 2:30 a.m.

At that point, the investigators noted that the cell tower used during the 2:30 a.m. call covered the area around the Wilcox Boulevard Tunnel. The Defendant said that he did not know why he would be in that area "unless [he] was out there trying to get [him] a skeeze or something." The Defendant then admitted that he "went back out" that morning, telling the investigators that he "probably snuck out of the house to try to make a booty call with somebody." The Defendant claimed that he went to the eastside of the city and "just rode around for a little while." The Defendant told the investigators that

"they sell kind of cheap" in that part of Chattanooga and he could pay a prostitute seven dollars for sex. However, the Defendant claimed that he did not meet anyone that morning. The Defendant insisted that he called the victim by mistake. The Defendant also claimed that he did not see the victim's Jeep while he was driving around that morning.

The Defendant admitted to the investigators that he had propositioned the victim "awhile back." The Defendant explained that about six or seven months before the victim's disappearance, he was drunk and offered to pay the victim twenty-five dollars for sex. The Defendant said that the victim told him no and that Mr. Wilkes talked to him after the fact and "squashed all of it." The Defendant said that it was not a big deal and that the victim was still comfortable with him afterwards. The Defendant denied ever having sex with the victim and claimed that he did not think of the victim "like that." The Defendant reiterated that he only propositioned her because he was drunk.

One of the investigators claimed that the cell phone records showed that the Defendant's phone was with the victim's phone at 2:30 a.m. The Defendant asked how far away the phones were and if the victim's phone was moving with his phone. The Defendant then denied that he was with the victim that morning and that he called her phone in an effort to find it. The Defendant also denied that he was with the victim after 11:00 p.m., that he went back to her home, or that he called her to arrange a meeting somewhere else. The Defendant further denied that he knew where the victim was or that he had killed her. The Defendant assured the investigators that if the victim were dead, then no evidence from her body would point to him.

The Defendant denied that his girlfriend did not know the victim was missing until she saw it on television and insisted that he told her. When asked about the pair of shoes that had been bleached, the Defendant said that he had cleaned them in bleach in order to get some grease off them. The Defendant said that his girlfriend might have complained about the bleach he used to clean the shoes. When asked about the abrasions on the back of his hands, the Defendant said that they probably had come from "pulling brush and stuff" for a class on landscaping that he was taking. The interview concluded with the investigators asking the Defendant where they should look for the victim, and the Defendant suggested that they look around where her Jeep was found.

Shortly after interviewing the Defendant, the investigators learned that the Defendant had access to a third house. The Defendant did not tell the investigators about this house, and they only learned about it after secretly following the Defendant and observing him spend the night at the house. On November 20, 2012, the investigators executed a search warrant at this house. Sgt. Montgomery recalled that the Defendant's "demeanor was quite different from" November 16th. Sgt. Montgomery thought the Defendant "was obviously upset, agitated, [and] seemed bothered by [their] presence" at

the third house. Det. Parks recalled that the Defendant arrived at the house toward the end of the search and that he was "agitated." Items were seized from this house, but subsequent forensic testing by the TBI revealed no physical connection between the items and the victim's disappearance. All of the locations were searched for evidence of blood, but none was found.

### III. Attempts to Corroborate the Defendant's Statements

In addition to the searches, the investigators attempted to corroborate the Defendant's statements. David Thomas Lindie testified at trial that he lived above the Defendant's apartment. On November 9, 2012, Mr. Lindie came across the Defendant walking along the road and offered to give him a ride. The Defendant told Mr. Lindie that he was walking to the Family Dollar to meet some friends and to work on a car. Mr. Lindie drove the Defendant to the Family Dollar and waited with him for about five minutes until a green Jeep pulled into the parking lot. When the Defendant saw the Jeep, he said "there they are" and got out of Mr. Lindie's truck.

The Defendant's girlfriend, Mary Morris, testified at trial that she and the Defendant had been in an "on and off" relationship for "a couple of years" and that the Defendant lived with her on November 9, 2012. Ms. Morris had the Defendant move out of her apartment after the police searched it on November 16, 2012. Ms. Morris recalled the Defendant's leaving before dark on November 9th and saying that he was going to fix the victim's car. Ms. Morris recalled that the Defendant called her that night, but she could not recall what the Defendant said. Ms. Morris believed that the Defendant got home around 10:00 or 10:30 p.m. that night. Ms. Morris did not notice anything unusual about the Defendant when he got home. Ms. Morris recalled that the Defendant took a bath and went to bed. Ms. Morris thought that the Defendant was in bed when she woke up the next morning and that he was wearing the same pajamas in which he went to bed.

Ms. Morris testified that she took sleeping pills and used a breathing machine at night. Ms. Morris admitted that the Defendant could have gotten out of bed and left the apartment without her noticing. Ms. Morris recalled that on November 10, 2012, the Defendant soaked a pair of gray shoes in a bucket of Clorox in the bathtub. Ms. Morris testified that she did not use Clorox because she had a lung condition. Ms. Morris also testified that she had seen the Defendant soak his shoes in Clorox before November 10th and that she had previously described the Defendant as being "too clean" and "always [keeping] his clothes clean." Ms. Morris testified that she learned about the victim's disappearance from a television news story.

Ms. Morris gave a statement to investigators on November 16, 2012. In that statement, she said that the Defendant had left on November 9, 2012, around 6:00 p.m. and returned around 11:00 p.m. Ms. Morris stated that the Defendant was wearing "them

gray tennis shoes that he soaked in Clorox" when he left. Ms. Morris also stated that the Defendant called her that night and said that he was at Walmart with the victim and the victim's mother. Ms. Morris said that she knew the Defendant routinely left the apartment after she went to sleep because she would find her car moved and low on gas the next morning. Ms. Morris also told the investigators that the Defendant had brought the bleach from his aunt's house and that she had never seen him bleach his shoes before November 10th. Ms. Morris stated that when she learned about the victim's disappearance, the Defendant said, "Don't cry, [the victim's] going to be all right." Ms. Morris said that she asked the Defendant about his being with the victim the night before she disappeared and he said that he "just took her to Walmart." The Defendant then "cut it off . . . [and] got angry a little bit."

Ms. Coleman testified at trial that she had known the victim for three or four years, that the victim was her "best friend," that her husband and Mr. Wilkes were friends, and that she had lived with the victim and Mr. Wilkes for a few months. Ms. Coleman knew the Defendant through the victim and Mr. Wilkes. Ms. Coleman recalled that the Defendant would go to the victim's home to work on cars and called Mr. Wilkes his cousin. According to Ms. Coleman, Mr. Wilkes "went to jail all the time," and the Defendant would "help [the victim] out" when Mr. Wilkes was incarcerated. Ms. Coleman denied ever having sex with the Defendant, but she claimed that the Defendant had previously offered to pay her money in exchange for sex.

Ms. Coleman testified that on either November 11 or November 12, 2012, she received a phone call from the Defendant. Ms. Coleman admitted that she was intoxicated during her conversation with the Defendant. Ms. Coleman testified that the Defendant was "fine" at the start of their conversation. The Defendant asked her to come over to his aunt's house because he wanted "to show [her] something." The Defendant told Ms. Coleman that his aunt was in the hospital. Ms. Coleman testified that she declined the Defendant's offer because she thought it would be "morbid" to be in his aunt's house while she was hospitalized. Ms. Coleman denied that there was any discussion about having sex or using cocaine during her conversation with the Defendant.

After Ms. Coleman rejected the Defendant's offer, the Defendant told her that the victim was missing. Ms. Coleman was unaware of the victim's disappearance, and she "flipped out" upon hearing the news. Ms. Coleman recalled that the Defendant said that he was the last person to see the victim and that he had gone to Walmart with the victim to get a part to fix her toilet. According to Ms. Coleman, the Defendant also said that the victim had dropped him off at the Family Dollar and then left "to go make a pill sale." Ms. Coleman testified that she repeatedly asked the Defendant who the victim was going to see, but the Defendant did not respond. Instead, the Defendant said that the victim's Jeep had been found with blood inside it.

Ms. Coleman denied that the victim sold pills. She admitted that Mr. Wilkes sold pills and that the victim would drive him to the sales because Mr. Wilkes did not have a valid driver's license. Ms. Coleman also admitted that she was heavily medicated when she spoke to the investigators and that she repeatedly refused to give them a formal statement because of her intoxication.

Tiara Vickerson testified that she worked with the victim and lived next door to her for a time. Ms. Vickerson and the victim would socialize outside of work. Ms. Vickerson knew Mr. Wilkes and had met the Defendant once. Ms. Vickerson testified that she lived with her boyfriend, Patrick Dixon. Ms. Vickerson testified that she never talked to the Defendant about the victim's disappearance and that she never called him.

Mr. Dixon testified that he knew Mr. Wilkes from having worked "on a few of [his] cars" and that he met the victim after she and Mr. Wilkes married. Mr. Dixon recalled that Ms. Vickerson was upset about the victim's disappearance, so he called the Defendant on November 10, 2012, to ask if he had seen or heard from the victim. The Defendant told Mr. Dixon that he had gone to Walmart with the victim the previous night and that he had brought her back to her home, taken her groceries inside for her, and left to go back home. Mr. Dixon testified that he called the Defendant several more times on November 11, 2012, to talk about the victim's disappearance. Mr. Dixon denied telling the Defendant that the victim's body had been found or that she had been found with a "slight pulse." Mr. Dixon testified that on November 11, 2012, he had no idea where the victim was. Mr. Dixon admitted that, at the time of trial, he was facing charges for selling cocaine.

Lawon Fortson testified that he knew Mr. Wilkes because Mr. Wilkes had worked on his car. Mr. Fortson knew the Defendant through Mr. Wilkes, but he did not know the victim. On November 9, 2012, Mr. Fortson received two phone calls from Mr. Wilkes's cell phone at 10:00 and 10:17 p.m. Mr. Fortson did not answer the calls and testified that he did not speak to the victim that night. Mr. Fortson testified that he did not know that Mr. Wilkes was incarcerated at that time. Mr. Fortson also claimed that he did not know that Mr. Wilkes sold pills and denied ever having bought or sold any narcotics with the victim. Mr. Fortson testified that the Defendant called him several times on November 10, 2012, and that he tried to call Mr. Wilkes back on the morning of November 11th. Mr. Fortson admitted that when investigators asked to search his car regarding this case, he told them that they would find marijuana inside the car.

Christopher Rozema testified at trial that he went to school with the Defendant and that he purchased Xanax from Mr. Wilkes. Mr. Rozema claimed that he had only met the victim one time and "barely" knew her. According to Mr. Rozema, the victim called him from Mr. Wilkes's cell phone on November 9, 2012, at 9:40 and 10:28 p.m. wanting to sell him some Xanax. Mr. Rozema testified that he turned down the victim's offer

because he was trying to quit abusing Xanax. Mr. Rozema further testified that he never spoke to the victim again after those conversations. Mr. Rozema denied meeting the victim that night and denied having anything to do with her her disappearance and murder. Mr. Rozema admitted that he had two prior theft convictions and that, at the time of trial, he was incarcerated for driving under the influence and domestic assault.

*IV. Discovery of the Victim's Body*

On the morning of November 25, 2012, Jeremy Pruitt and two of his friends were duck hunting on South Chickamauga Creek. Around 8:30 or 9:00 a.m., Mr. Pruitt saw what he thought were some "Halloween decorations" on the creek bank. Mr. Pruitt and his friends brought their boat over to the bank and got out. They quickly realized that what they had seen was a body and called 911. CPD Officer Eric Hindman was the first officer to respond. He arrived at the 3700 block of Youngstown Road, which was about two or three feet up an embankment from where the victim's body was found. Officer Hindman found a bra on the road just inside the guardrail on the same side of the road as the creek.

The body was on its back. It had been decapitated and had no hands. There were shoes and jeans on the body, but the upper torso was naked and "significantly decomposed." There was a path leading from the body to the road and the foliage was "leaning towards the bank of the creek," which suggested to Sgt. Montgomery that the body had been moved from the roadside to the bank of the creek. A white t-shirt and a yellow "key fob" were found in the brush near the body. The t-shirt was inside out and soiled. A lighter and a white methadone pill were found in the pockets of the jeans. The clothing recovered at the scene was similar to what the victim had been seen wearing on the surveillance videos taken at Walmart and the Murphy gas station on November 9, 2012. Mr. Wilkes identified the body as the victim based on photographs of the victim's tattoos. Subsequent DNA testing confirmed that the body was the victim. The victim's head and hands were never found.

Based upon the discovery of the victim's body, the investigators again searched Ms. Morris's apartment, the Defendant's aunt's house, and the third house in which he had been staying. More items were seized. However, subsequent forensic testing by the TBI revealed no physical connection between the items and the victim's murder. The police also searched the Defendant's car. They discovered that the car had recently been cleaned and were unable to recover any fingerprints from the car. There was no evidence of blood in the Defendant's car and items seized from the car were revealed to have no physical connection to the victim's murder based upon subsequent forensic testing by the TBI. The victim's cell phone, Mr. Wilkes's cell phone, the victim's purse, and the keys to the victim's Jeep were never recovered. Sgt. Montgomery admitted at trial that the investigators did not know the specific location where the victim was murdered. Ms.

-13-

Morris testified at trial that the Defendant would sometimes go fishing and that he would get bait from a tackle shop not far from where the victim's body was found.

*V. Forensic Evidence*

Doctor James Kenneth Metcalfe, chief medical examiner for Hamilton County and an expert in forensic pathology, performed an autopsy of the victim's body. Dr. Metcalfe testified that the victim's body was in the process of decomposing when his office received it and that the process was "fairly advanced in the exposed areas." Dr. Metcalfe explained that the autopsy "was hampered by the fact that [the victim's body] had decomposed significantly." Dr. Metcalfe was able to determine that the victim had methadone at a level within the "therapeutic" range in her blood at the time of her death. The victim also had a blood alcohol level of .057 percent. Dr. Metcalfe found contusions to the victim's "mid abdomen and neck," but he was unable to determine whether these were inflicted pre- or post-death. Dr. Metcalfe was also unsure if the victim had been sexually assaulted because there was "no unequivocal injury" to her pelvic area. Anal and vaginal swabs taken from the victim during the autopsy were negative for the presence of semen. Dr. Metcalfe concluded that the manner of the victim's death was homicide, but he was unable to determine the cause of her death.

Doctor Murray K. Marks, an expert in forensic anthropology and a forensic anthropologist at the Knox County Regional Forensic Center and the University of Tennessee Medical Center, observed the victim's autopsy and took samples from several of her bones. Specifically, Dr. Marks collected samples of two vertebrae from the victim's neck and "the ends of four bones from the forearm[s] of the body." Dr. Marks examined the victim's left ulna and radius. The victim's left radius had saw marks and jagged edges from the bone being broken, what Dr. Marks referred to as "a breakaway spur." Dr. Marks testified that the wounds were on the wrist or hand end of the bone. The victim's left ulna had "deeper" saw marks and was "severed all the way through." Dr. Marks opined that the cuts were made by a four-millimeter-thick blade. Dr. Marks also opined that the blade was a manual saw given all of the "false start" wounds he found on the bones. Dr. Marks found the same pattern on the bones taken from the victim's right arm, with the right radius' having been broken and the right ulna's having been "severed all the way through."

With respect to the vertebrae taken from the victim's neck, Dr. Marks testified that they were sawed until the victim's head broke off when "enough pressure [was] applied." Dr. Marks testified that the saw marks were on the backside of the vertebrae and opined that the victim was face down when her head was removed. Dr. Marks further testified that the vertebrae would have been difficult to saw through. Dr. Marks explained that the perpetrator would have had to saw through "spinal cord, a lot of blood vessels on either side of the neck, and then a lot of musculature up at the base of the skull." Dr. Marks

testified that there was no way that he could determine whether the victim was alive or dead when her head and hands were removed. Sgt. Montgomery testified that no saw with a four millimeter blade was recovered during the investigation of the victim's murder.

The victim's Jeep was impounded and searched by CPD crime scene investigators. In the back seat, the investigators found blood smears on the lower right of the center console and the bottom interior of the rear passenger door. The investigators also found blood stains on the left side of the center console and the floor board of the rear passenger seat. On the front passenger side, the investigators found a Coke can, a phone book, a receipt from the Murphy gas station, and the back of an earring on the floor board. In the passenger seat, they found a wad of blonde hair and an earring. Blood was found on the floor board and the dash of the front passenger seat. There was blood spatter and smears on the glove compartment and dash. There was also blood spatter on the front passenger door and the windshield.

The investigators took blood swabs from several areas of the Jeep and also collected several cigarette butts from the center console. A partial shoe print was taken from the interior of the driver's side window, but it did not match any of the Defendant's shoes that were seized by the police. There was no vegetation or debris found inside the Jeep. One of the investigators who searched the Jeep, Gregory Mardis, testified at trial that the blood smears found in the back passenger seat area suggested that "[s]omething with blood on it went by that seat and rubbed on it as it went by." He also testified that almost all of the blood was found on the passenger side of the vehicle and that is likely where whatever act of violence occurred.

Doctor Laura Boos of the TBI testified at trial as an expert in serology and DNA analysis. Dr. Boos tested several items involved in this case. Dr. Boos's analysis of one of the cigarette butts found in the victim's Jeep revealed the presence of both the Defendant and the victim's DNA, with the Defendant being the major contributor. The same was also true of a Newport cigarette butt found in the Jeep. However, that cigarette butt also tested positive for the presence of human blood. The Defendant stated during his interview with Det. Parks and Sgt. Montgomery that he smoked Newport cigarettes, and a receipt for Newport cigarettes was found at the Defendant's aunt's house. A swab taken from the Jeep's steering wheel also tested positive for human blood. Based upon DNA analysis, Dr. Boos concluded that the blood found inside the Jeep belonged to the victim. Dr. Boos testified that the shoes seized from the Defendant's apartment were negative for human blood. However, Dr. Boos testified that putting the shoes in bleach would wash off the blood and destroy any DNA on the shoes.

Dr. Boos also tested the bra found on Youngstown Road near the victim's body. Dr. Boos's analysis revealed the presence of human blood and the victim and the

-15-

Defendant's DNA. The victim was the major contributor and the Defendant was the minor contributor. Dr. Boos testified that she could not determine if the Defendant's DNA was on the bra before or after the blood was deposited on it. Dr. Boos was asked if the Defendant's DNA could have been deposited on the bra simply by touching it. Dr. Boos responded that "a simple touch" "would not leave enough DNA in a mixture" to be detectible. Instead, the Defendant would have needed to touch the bra with "enough force and friction to leave enough skin cells among [the victim's] DNA." Dr. Boos was unable to find semen on any of the victim's clothes. Dr. Boos did find blood on the victim's shirt and one of her shoes. However, Dr. Boos was unable to create a DNA profile from these samples. Dr. Boos was able to conclude that blood found on the victim's jeans belonged to the victim.

Mark Hamilton, a civilian CPD employee, testified at trial as an expert in "cellular records analysis." Mr. Hamilton testified that his analysis was based on billing records provided by the cell phone providers for the Defendant, the victim, and Mr. Wilkes. Mr. Hamilton noted that the Defendant and the victim called each other several times throughout the day on November 9, 2012. The victim's last answered call was a phone call from the Defendant at 8:07 p.m. The last calls from Mr. Wilkes's phone were made at 10:00 and 10:17 p.m. on November 9, 2012. After those calls, no calls were made or connected to Mr. Wilkes's cell phone. The Defendant called the victim's phone at 2:32 a.m. on November 10, 2012. The call lasted six seconds. After that call, the Defendant did not call the victim's phone again.

Mr. Hamilton then testified about establishing the location of cell phones based upon the cell phone tower records. Mr. Hamilton explained that this method of establishing the location of a cell phone was not like "GPS tracking" and was "very broad . . . [because it did not provide] detailed spots out there . . . on a street." Rather, this type of evidence provided "a broad swipe." Mr. Hamilton admitted that this was not a "precise" way to establish the location of a cell phone. Mr. Hamilton further admitted that he could not say that a phone call was made from a particular place, just that it was consistent with a certain area.

Mr. Hamilton testified that the victim's cell phone connected to Cricket tower 612, which covered a geographic area that included the victim's home, for the phone calls made between approximately 5:00 and 7:30 p.m. on November 9, 2012. During this same timeframe, the Defendant's cell phone connected to T-Mobile tower 28903, which covered a geographic area that included the Defendant's apartment with Ms. Morris. From approximately 7:50 p.m. until the victim's last answered call at 8:07 p.m., both the victim and the Defendant's cell phones connected to the corresponding Cricket and T-Mobile towers that covered the area around the Walmart and Murphy gas station.

-16-

At 10:00 p.m., Mr. Wilkes's cell phone connected to Cricket tower 612, which covered a geographic area that included the victim's home, the Defendant and Ms. Morris's apartment, and the Family Dollar store. At 10:17 p.m., Mr. Wilkes's cell phone connected to Cricket tower 658, which covered a geographic area that included the Defendant's aunt's house. At 2:32 a.m. on November 10, 2012, the Defendant's cell phone connected to T-Mobile tower 8693, which covered a geographic area that included the Wilcox Boulevard Tunnel and the location where the victim's Jeep was found. The victim's cell phone from this same call connected to Cricket tower 611, which covered the same geographic area as T-Mobile tower 8693. From that point on, all of the phone calls to Mr. Wilkes and the victim's cell phones connected to Cricket tower 611.

At 10:48 a.m. on November 10th, the Defendant's cell phone connected to T-Mobile tower 8681, which covered a geographic area that included the third house police searched in connection with their investigation of the Defendant. The Defendant's cell phone then connected to T-Mobile tower 8693, which covered the Wilcox Boulevard Tunnel area, at 10:57 a.m. Mr. Hamilton testified that he "field tested" T-Mobile tower 8693 and that he could not connect to it from Ms. Morris's apartment. Mr. Hamilton also admitted that none of the phone records he reviewed involved any towers near the Youngstown Road area where the victim's body was discovered.

Michael Alexander Turbeville testified at the Defendant's trial that he had been a TBI special agent and forensic scientist for seventeen years and that he was the supervisor of the TBI's "forensic biology unit." Agent Turbeville testified that in April 2006, he "[gave] testimony . . . in Hamilton County" as "an expert witness." Agent Turbeville was asked about receiving an oral swab and fingernail clippings from a woman named Dinah Burney and developing a DNA profile from those items. Agent Turbeville was then asked if the samples taken from those items were "suitable DNA for a genetic comparison" and if he was "able to make a meaningful comparison." Agent Turbeville responded that it was and that the Defendant was present when he testified about these matters "[d]uring the course of [a] judicial proceeding in April 2006."

## VI. Verdict

Based upon the foregoing evidence, the jury convicted the Defendant of premeditated first degree murder and abuse of a corpse. The trial court subsequently sentenced the Defendant to a total effective sentence of life imprisonment plus four years. The trial court also denied the Defendant's timely motion for new trial. This appeal followed.

## ANALYSIS

### I. Issues Requiring Reversal

-17-

## A. Separation of Sequestered Jury

The Defendant contends that the jury separations occurred during the trial when the sequestered jury members were allowed to go to their individual homes, unsupervised, to pack their belongings at the start of the trial, when they were allowed to make phone calls to family members each night for the duration of the trial, and when they were allowed to visit with family members the day before the trial concluded. The Defendant argues that the State failed to meet its burden to prove that he was not prejudiced by these separations. The State concedes that a separation occurred when the jury was allowed to go to their individual homes, unsupervised, to pack. However, the State argues that it satisfied its burden because the foreperson of the jury testified during the motion for new trial hearing that he did not obtain any outside information during this separation and because when the trial court asked the jury the next morning if they had followed its instructions, the jurors responded "in the affirmative." The State further responds that there was no separation during the phone calls and the in-person meeting with family members because the jurors were in the attendance and control of court officers for these encounters. In the alternative, the State argues that it met its burden to show that the Defendant was not prejudiced because of the foreperson's testimony and the jurors responding daily "in the affirmative" when asked by the trial court if they had followed its instructions.

### 1. Factual and Procedural Background

The trial court granted the Defendant's motion to sequester the jury due to its concern "about post-selection publicity." The trial court explained that it was concerned that "the media [was] aware that [the Defendant had] been previously" acquitted of murder and rape charges several years before this case. The trial court also noted that there had been news reports about the Defendant's case following the hearing on the Defendant's bond reduction motion and that those reports mentioned that the Defendant "was charged with dismembering of a woman and that he'd been previously charged." To that end, the trial court stated that it would "do sequestration the old-fashioned way" and not allow the jurors to "have any cellular devices or electronic devices." The trial court stated that if the jurors wanted to make phone calls during the trial, they would "have to ask for permission to do that with the [court] officers and they'll have to have the officer present while they're talking."

Defense counsel requested that before the jury was allowed to go home and pack, the trial court admonish them not to research the case, pack any electronic devices, or "speak to anyone in the case." The trial court stated that it would do so. At the conclusion of jury selection, the trial court stated to the attorneys as follows:

All right. What I intend to do tonight is go ahead and swear the jury and read the preliminary jury instructions. [Tennessee] Rule [of Criminal Procedure] 30 says that the instructions shouldn't be read until after they're sworn.

I am going to let them go home and pack belongings and then come back. I'm going to tell them to be back at the hotel no later than 9 o'clock. If they've got a problem, they can call one of the officers.

After I let them walk out back to the jury room, I'm going to swear the officers that once they are at the hotel, that the officers will keep them sequestered.

But I think it's important to give the preliminary instructions about research and communication and so forth before they leave.

The trial court then asked if everyone was "in agreement with that," and the prosecutors and defense attorneys stated that they were.

The jury was sworn. The trial court provided the jury with a preliminary instruction that they were not to "do any research on [their] own" or to "engage in any outside reading, visit any places mentioned in the case, or try to learn about the case outside of [the] courtroom in any other manner." The trial court then specifically instructed the jurors not to view any media about the case or talk with anyone about the case while they went home to pack. After concluding the rest of its preliminary instructions, the trial court excused the jury to go home. The next morning, before the parties gave their opening statements, the following exchange occurred:

[Trial court]: Did all of you follow the instructions that I gave you about not discussing the case with anyone?

(Thereupon, jurors answer in the affirmative.)

[Trial court]: All right. You all indicate that you did.

Did all of you follow the instructions I gave you about not getting any information about the case for any other source?

(Thereupon, jurors answer in the affirmative.)

[Trial court]: All right. You're not going to be allowed to read the newspapers or watch television news, and I've already instructed you not to do any internet research about the case. All right.

-19-

At the start of each day of the trial, the trial court would ask the jury if they had "followed the directions and admonitions that [it had] given [them] previously" and each time the record reflected that the "jurors answer[ed] in the affirmative." The trial ran from a Tuesday until the following Monday. The trial court did not hold proceedings on Sunday to give the jury a chance to rest and the attorneys time to prepare their closing arguments. Prior to Sunday, the trial court informed the attorneys that it was "going to bring the [jurors'] families" in on Sunday. The trial court stated that the court officers would be present and that it would instruct both the jurors and their families not to discuss the case. The Defendant did not object to this plan. The trial court gave its final jury instructions to the jury on Saturday night. On Monday morning, the trial court asked the jurors if they and their family members had followed its instructions not to discuss the case, and the jurors responded "in the affirmative." The trial court also asked the jurors if they had "learned anything about [the] case outside the confines of [the] courtroom," and the jurors responded "in the negative."

The Defendant, in his motion for a new trial, alleged that the trial court "erred by allowing the sequestered jury to separate." The trial court held a hearing on the Defendant's motion for new trial on May 26, 2015. The Defendant presented news articles about his 2006 murder trial that were available at the time of this trial along with news articles about this trial that contained significant and graphic details about his 2006 murder trial.

Officers Tim Higgs and Jim Picket of the Hamilton County Sherriff's Office testified at the hearing. Officer Higgs testified that he was the court officer and was one of four officers who supervised the jury while they were sequestered. Officer Higgs recalled that after the jury was selected and sworn, he and the other court officers went to the hotel to prepare for the jury's arrival. Officer Higgs admitted that the jury was allowed to go home and that none of the court officers observed the jurors until they arrived at the hotel. Officer Higgs recalled that the jury was instructed before they left not to talk to anyone or research the case. Officer Higgs testified that none of the jurors told him that they had received outside information after leaving the courthouse and that he did not think that any of them tried to circumvent the rules.

When the jurors arrived at the hotel, the officers took their cell phones. Officer Higgs testified that the jurors were allowed to make nightly calls during the trial. Officer Higgs explained that the court officers had the trial court's permission prior to the start of the trial to allow juror phone calls when an officer was present. Officer Higgs did not know if defense counsel was aware that phone calls were being made during the trial. Officer Higgs testified that he and the other court officers would split the jury up into groups of three to five jurors. Officer Higgs further testified that he would dial the

number for the juror, hand the phone over to the juror, and then observe the phone call. The jurors were limited to ten minutes per phone call.

Officer Higgs testified that he was close enough to hear the jurors' side of the conversation, but he admitted that he could not hear what the person on the other end of the phone was saying. According to Officer Higgs, not every juror made a phone call every night. However, Officer Higgs could not recall which jurors those were. Officer Higgs admitted that the jurors made their phone calls at the same time; therefore, he had to listen to more than one conversation at a time. Officer Higgs testified that he did not hear any of the jurors discussing the case and that he did not believe that the jurors got outside information during these phone calls. However, Officer Higgs was not present for all of the jury members' phone calls.

Officer Higgs recalled that the jury was allowed to meet with their families for approximately one-half hour the day before the trial concluded. Officer Higgs testified that the meeting occurred at 1:00 p.m. in a large room at the courthouse. The court officers had set up tables and chairs in the room, and the jurors met with their families in "little clusters." Officer Higgs estimated that there were about twenty family members there that day. Officer Higgs recalled that the trial court instructed the jury not to talk about the trial with their family members and that it then instructed the jurors' family members to do the same. Officer Higgs testified that he and three other court officers walked around the room during the meeting listening for "key words." Officer Higgs admitted that it was loud in the room "because everybody [was] talking" and that he could not hear every conversation. Officer Higgs could not remember if the attorneys were present for the family meeting.

Officer Pickett testified that he assisted in supervising the jurors during their sequestration. Officer Pickett admitted that no one accompanied the jurors when they went home to pack and that the court officers had no control over the jurors at that time. Officer Pickett recalled that the jurors would make phone calls in groups of three or four along with a court officer. Officer Pickett testified that these calls occurred "quite often" during the trial and that the jurors would all be on the phone at the same time. Officer Pickett also testified that the jurors would dial the phones themselves. Regarding the family meeting, Officer Pickett testified that he locked the doors to the meeting room and patrolled outside the room during the meeting. Officer Picket testified that he did not believe the jurors had been exposed to outside information during the trial.

Following Officer Pickett's testimony, the trial court continued the hearing until July 10, 2015, to allow the State to investigate a possible list of those who attended the family meeting. The only evidence the State presented at the July 10, 2015 hearing was the testimony of the foreperson of the jury. The foreperson testified that he did not talk to anyone or access any media when he was allowed to go home and pack at the start of the

trial. Regarding the telephone calls, the foreperson recalled that the jurors were allowed, at the end of the day, to go to one of the officers' rooms and call family members for five to ten minutes. The foreperson testified that everyone who wanted to make a phone call would be in the room and that their conversations occurred at the same time. According to the foreperson, the court officers would hand the jurors their phones without asking who they were going to call. The jurors were "able to dial any number [they] wanted."

The foreperson testified that every member of his group made phone calls every night of the trial. The foreperson further testified that his family did not say anything to him about the trial during these phone calls. The foreperson admitted that he did not know what the other jurors heard or talked about during their phone conversations. However, the foreperson testified that he did not think any of the other jurors had received outside information. The foreperson also testified that he never saw any of the other jurors make a phone call outside the presence of the court officers. Regarding the family meeting, The foreperson testified that he and his family did not talk about the trial and that he did not hear any of the other jurors engage in that kind of conversation.

The trial court entered a written order denying the Defendant's motion for new trial. With respect to this issue, the trial court concluded that a separation occurred when the jury was allowed to go home and pack. However, the trial court concluded that the State had met its burden of establishing that the Defendant was not prejudiced by the separation based upon the testimony of Officers Higgs and Picket and of the foreperson. Regarding the phone calls and family meeting, the trial court concluded that no separation had occurred because the jurors remained "sufficiently under the control of the court officers." Alternatively, the trial court concluded that the State had met its burden of showing that the Defendant had not been prejudiced by these acts due to "the answers under oath, each day, by each juror to the [c]ourt's inquiry regarding whether the jurors had gained any information about the case outside of the courtroom."

## 2. Sequestration

The rule of jury sequestration[3] has a long history and initially, at common law, "required that jurors be physically kept together within the presence of each other without food, drink, fire[,] or light until a verdict was agreed upon." State v. Bondurant, 4 S.W.3d 662, 671 (Tenn. 1999). In modern times, "[t]he common law rule has been greatly relaxed" and is now "a creature of statute." Id. To that end, Tennessee Code Annotated section 40-18-116 provides that, in all non-death penalty criminal

---

[3] This rule is not to be confused with Tennessee Rule of Evidence 615 which provides for the sequestration of witnesses and is commonly referred to throughout this jurisdiction as "the Rule." See Donald F. Paine, Book Review, 39 Tenn. B.J. 35 (June 2003) (reviewing Black's Law Dictionary (7th ed. 1999)).

prosecutions, "jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case."

The purpose of the sequestration rule is "to preserve a defendant's right to a fair trial and impartial jury by protecting jurors from outside influence so that the verdict will be based only upon evidence developed at trial." Bondurant, 4 S.W.3d at 671. This purpose "is perhaps more important in the modern age, considering the pervasiveness of media coverage and publicity" of criminal acts and prosecutions. Id. As such, Tennessee courts have long recognized that "[t]oo much strictness cannot be used to keep a jury charged with the life or liberty of a citizen, from mingling with the community during their deliberations, and this the more especially where there is any excitement for or against the prisoner." Id. at 672 (alteration in original) (quoting Cochran v. State, 26 Tenn. (7 Hum.) 544, 547 (1847)).

### 3. Separation

The test of keeping a sequestered jury "together" is no longer a literal one. Bondurant, 4 S.W.3d at 671. Instead, the test "is whether a juror passes from the attendance and control of the court officer." Id. The burden is on the defendant "to show a separation of jurors." State v. McClain, 667 S.W.2d 64, 66 (Tenn. 1984). If there is no evidence "adduced by [the] defendant that there was any improper separation of jurors," then there is "no affirmative burden upon the State to show no prejudice occurred." Id. However, "once separation of a sequestered jury has been shown by the defendant, the State has [an affirmative] burden of showing that such separation did not result in prejudice to the defendant." Bondurant, 4 S.W.3d at 672. "If the State fails to meet the burden of showing that the separation did not result in prejudice, a new trial is required." Id.

The Defendant is not required to show that the jurors were, "during their absence, subjected to improper influence from others; it is sufficient if they might have been." Bondurant, 4 S.W.3d at 673 (quoting McLain v. State, 18 Tenn. (10 Yer.) 241, 242 (1837)). Put another way, "[i]t is the opportunity of tampering with a juror, afforded by the separation which constitutes the ground for a new trial." Id. at 672 (quoting Gonzales v. State, 593 S.W.2d 288, 291 (Tenn. 1980)). However, if the State meets its burden by showing that "such separation afforded no such opportunity [for tampering with a juror], [then] there can be no cause for a new trial." Id. (quoting Gonzales, 593 S.W.2d at 291). With these rules in mind, we now turn to the question of whether the incidents complained of in the Defendant's brief amounted to separations.

### a. Jurors Allowed to Go Home and Pack

-23-

The rule of sequestration requires that the jury not be permitted "to separate from each other <u>after they have been sworn</u>, and mingle with the balance of the community." <u>Bondurant</u>, 4 S.W.3d at 672 (emphasis added) (quoting <u>McLain</u>, 18 Tenn. (10 Yer.) at 242). Trial courts are not permitted to "swear any of the jurors until the whole number is selected for a jury." Tenn. Code Ann. § 40-18-106. Once the jury is sworn, the rule of sequestration is in effect, and the jurors should not be allowed to leave the attendance and control of the court officers.

Here, the trial court mistakenly thought, citing Tennessee Rule of Criminal Procedure 30,[4] that it could not admonish the prospective jurors unless they were sworn. However, it has long been the rule in this state that "a trial judge has the discretion to allow the separation of tentatively selected jurors prior to the time the jurors are sworn to try the case, so long as appropriate admonitions are administered." <u>State v. Vaughan</u>, 144 S.W.3d 391, 405 (Tenn. Crim. App. 2003) (citing <u>State v. McKay</u>, 680 S.W.2d 447, 453 (Tenn. 1984)).

It is undisputed that, rather than the trial court admonishing the tentatively selected jurors and allowing them to separate, the jury was sworn and then allowed to leave the attendance and control of the court officers. As such, the Defendant has shown a separation of the jurors. <u>See</u> <u>Bondurant</u>, 4 S.W.3d at 672-73 (holding that the defendant had "established a prima facie showing of [a] jury separation" when the jurors were allowed to drive themselves between their hotel and the courthouse and the court officer submitted an affidavit that he had no control over the jurors during that time).

### b. Jurors Allowed to Make Phone Calls

Recently, this court has held that the possession of cell phones by members of a sequestered jury did not constitute a separation of the jury but rather a mere "possibility of a separation." <u>State v. Rayfield</u>, 507 S.W.3d 682, 704 (Tenn. Crim. App. 2015). However, unlike this case, the defendant in <u>Rayfield</u> did not allege or offer "any proof that [the jury] actually used their phones to communicate with persons outside the jury or to engage in prohibited internet research about the case." <u>Id.</u> Here, it is undisputed that multiple members of the jury made phone calls throughout the trial.

The State argues that a separation did not occur as a result of the juror phone calls because a court officer was in the room with the jurors when the phone calls were made. However, the phone calls were made in groups of three and four jurors with all of the conversations occurring at the same time. More importantly, the court officers were able

---

[4] Rule 30(d)(1) provides that "[i]mmediately after the jury is sworn, the court shall instruct the jury concerning its duties, its conduct, the order of proceedings, the general nature of the case, and the elementary legal principles that will govern the proceeding."

to hear only the jurors' side of the conversations and did not hear what the outside persons said to the jurors.

In State v. Tracey Pendergrass, four jurors were allowed to make phone calls during their deliberations. No. 03C01-9608-CC-00310, 1997 WL 760724, at *8 (Tenn. Crim. App. Dec. 11, 1997). Three court officers were in the room with the jurors during the phone calls. Id. One of the officers testified that he "did not hear any portions of the conversations" while the other officers testified that they "did not know what was being said on the other end of the telephone conversations." Id. Based upon these facts, a panel of this court concluded that the jurors were sufficiently outside the attendance and control of the court officers for a separation to have occurred. Id.

The facts of this case are similar to the facts in Pendergrass; therefore, a separation occurred during the juror phone calls because the court officers could not hear the other side of the jurors' conversations.[5] This court is mindful of the hardships the jurors endured during the sequestration and the trial court's desire to allow them to communicate with their family members. To ensure that jurors do not leave the attendance and control of the court officers, the better practice would be to have the jurors make phone calls one at a time in the presence of a court officer and on speaker phone so the officer can hear both sides of the conversation.

### c. Jurors Allowed a Family Meeting

A panel of this court addressed a situation similar to the family meeting that occurred in this case in James Dellinger and Gary Wayne Sutton v. State, No. E2004-01068-CCA-R3-PC, 2006 WL 1679595, at *23 (Tenn. Crim. App. June 19, 2006). In Dellinger, the trial court held a "family night" at the jury's hotel. Id. The event was held in a large room with the court officers "always there assisting" the jurors. Id. This court

---

[5] The concurring opinion, citing to James Dellinger and Gary Wayne Sutton v. State, No. E2004-01068-CCA-R3-PC, 2006 WL 1679595, at *21-23 (Tenn. Crim. App. June 19, 2006), states that there was "no meaningful distinction" between the juror phone calls and the family meeting discussed later in this opinion. However, during the family meeting in this case and the "family night" discussed in Dellinger the jurors and the third parties that they spoke to were both present and under the direct supervision of the court officers. See Dellinger, 2006 WL 1679595, at *23. During the phone calls, the court officers could not hear the third parties' side of the conversation. The concurring opinion cites to the fact that "[n]either the testifying court officers nor the jury [foreperson] had any indication that any information relevant to the trial had been received during the telephone calls" to support its conclusion that a separation did not occur. However, in determining whether a separation has occurred, the defendant does not have to show that the jurors "were subjected to improper influence from others, it is sufficient if they might have been." Bondurant, 4 S.W.3d at 673 (emphasis added) (quoting McLain, 18 Tenn. (10 Yer.) at 242). It is my belief that one court officer who was unable to hear what the third parties were saying to the jurors and supervising three or four jurors who were making phone calls at the same time provided ample opportunity for tampering with the jurors.

concluded that the jurors were not outside the attendance and control of the court officers because they were "confined to one large room" under the supervision of the officers and there was "no evidence that any jurors left the conference room to visit with their family members without supervision." Id.

Here, the jurors and their family members were all in the same room with the doors locked and with three to four court officers observing their conversations. Additionally, the trial court instructed both the jurors and their family members not to discuss the trial immediately prior to the meeting. We conclude that the facts regarding the "family night" in Dellinger are similar to the family meeting held in this case. Accordingly, we hold that the Defendant failed to make a prima facie showing that a separation occurred during the family meeting.

### 4. Prejudice to the Defendant

Having determined that separations occurred when the jury was allowed to go home unsupervised to pack and when they were allowed to make phone calls throughout the trial, we now must determine whether the State satisfied its affirmative burden of demonstrating that the Defendant was not prejudiced by these separations. In State v. Jackson, our supreme court held that the State had met its burden when it "presented the testimony of all [the] jurors on the panel as well as that of the deputy in charge of the jurors and that deputy's husband" with whom some of the jurors had interacted. 173 S.W.3d 401, 410-11 (Tenn. 2005). The testimony of the jurors and the deputy that "they did not discuss the trial with any non-jurors" was sufficient to show that the defendant had not been prejudiced by the separation. Id. at 411.

Likewise, a panel of this court in State v. Jeffrey D. Allen addressed whether the State had met its burden when "several of the jurors had been seen talking on their cell phones during a break in the case." No. W2008-01348-CCA-R3-CD, 2009 WL 2502000, at *9 (Tenn. Crim. App. Aug. 17, 2009). This court concluded that the State met its burden because "each juror assured the [trial] court that he or she had not received or imparted any information about the case and that the conversations were unrelated to the trial." Id. This occurred after the trial court questioned the jury as a whole and then polled the jury, "receiving each juror's assurance that any cell phone conversations that may have occurred concerned only personal or family matters." Id.

Here, the State argues that the testimony of the foreperson and Officers Higgs and Pickett was sufficient to meet its burden of showing that the Defendant was not prejudiced by the separations and that there was no need to recall all of the jurors. However, Officers Higgs and Pickett did not observe any of the jurors while they went home to pack and had no knowledge of whether the jurors spoke to any outside parties or received any outside information during this separation. Likewise, the officers did not

observe all of the phone calls made during the trial. While the foreperson testified that he did not receive any outside information during these separations or from the other jurors, he did not know what the other jurors did when they went home to pack or the content of their phone conversations. The testimony of the entire jury may not always be necessary when there has been a jury separation, but it is in situations like this one where all of the jurors were implicated in the separation.

The State also argues that the jury's answer "in the affirmative" when asked if they had followed the court's admonitions during the trial was sufficient proof that the Defendant was not prejudiced by the separations. We disagree, while such group questioning of the jury is a useful prophylactic to remind the jurors of their obligations, when a separation has occurred each juror implicated must individually answer as to the specifics of the separation and the possible prejudice to the defendant. Here, the trial court never specifically asked the jurors about their phone calls and, unlike in Allen, the trial court did not poll the jury to receive "each juror's [individual] assurance" regarding the separation to go home and pack or their phone calls. See 2009 WL 2502000, at *9. Furthermore, limiting the inquiry to a group voir dire of the jury by the trial court denies the State and the Defendant the opportunity to question the jurors about the separation and any possible outside influence. See Pitts v. State, 300 So. 2d 416, 420 (Ala. Crim. App. 1974) (holding that group questioning of the jury by the trial court was not sufficient to satisfy the prosecution's burden of proving the defendant was not prejudiced by a jury separation because it denied the defendant the "opportunity of cross-examination").

Finally, the State argues that this court should "follow the same remedy" provided in Pendergrass "and remand to the trial court in order for all the jurors who made phone calls to testify about their conversations" rather than order a new trial. However, the trial court in Pendergrass allowed the defendant to put on proof about an alleged jury separation but did not allow the State to do so. 1997 WL 760724, at *8. This court remanded the case for an evidentiary hearing because the State "is entitled to offer whatever proof which may be available to show" that the defendant was not prejudiced. Id. at *8-9; see also State v. Smith, 416 S.W.3d 38, 49 (Tenn. 2013) (holding that "[w]hen a trial court fails to hold an evidentiary hearing to inquire into juror misconduct, the proper remedy is to remand the case for such a hearing").

Here, the trial court held a hearing on the jury separations, the State was allowed to present evidence, and the trial court granted the State a continuance to further investigate this issue. As such, we conclude that a new trial, not a new evidentiary hearing, is the proper remedy. See Bondurant, 4 S.W.3d at 672 (holding that when "the State fails to meet the burden of showing that the separation did not result in prejudice, a

new trial is required"). Accordingly, we reverse the judgments of the trial court and remand this matter for a new trial.

## B. Testimony Regarding Previous Murder Trial

The Defendant contends that the trial court erred in admitting testimony from Agent Turbeville regarding Agent Turbeville's testimony during a previous murder trial at which the Defendant was acquitted. The Defendant argues that the trial court erred by not analyzing this issue under Tennessee Rule of Evidence 404(b), which prohibits evidence of other bad acts in order to show conformity with a character trait. In the alternative, the Defendant argues that this evidence should not have been admitted because its probative value was substantially outweighed by the danger of unfair prejudice.[6]

The State responds that Rule 404(b) was not applicable to Agent Turbeville's testimony because the Defendant failed to meet the procedural requirements of Rule 404(b) and because Agent Turbeville's testimony "was about his previous trial testimony, not about a prior bad act of the [D]efendant." The State further argues that Agent Turbeville's testimony was probative because "it explained why the [D]efendant removed the victim's hands and head" and was not substantially outweighed by the danger of unfair prejudice because any reference to the fact that the Defendant had previously been tried for murder was "sanitized." In the alternative, the State argues that any error in the admission of Agent Turbeville's testimony was harmless because his testimony did not seem to have "any effect whatsoever on the jury."

### 1. Factual and Procedural Background

Prior to trial, the State filed a motion seeking to introduce Agent Turbeville's testimony regarding the Defendant's 2006 murder trial. Specifically, the motion stated that it sought to introduce the following: "That on April 19th of 2006 the Defendant was present at a judicial proceeding during which Agent Mike Turbeville of the [TBI] restified that genetic material suitable for a DNA comparison was recovered from an oral swab and nail clippings of a deceased woman."

The State argued that the testimony would be probative "to show that the Defendant had knowledge at the time of [the victim's] death that DNA evidence could potentially be recovered from [her] mouth and hands." The trial court held a pretrial

---

[6] The Defendant also argues that this evidence was inadmissible because he was acquitted and the records of his trial were subject to this state's expungement statute. See Tenn. Code Ann. § 40-32-101(a)(1)(F). However, expungement upon acquittal is not automatic but is performed upon the defendant's request or later petition. Id. There is no proof in this record that the Defendant took advantage of the expungement statute and that the records of his trial were actually expunged.

hearing on this matter, at which the State argued that Rule 404(b) did not apply to Agent Turbeville's testimony because it would be "sanitized" from any reference to any other bad act committed by the Defendant and "any danger of unfair prejudice."

The trial court accepted the State's argument that Rule 404(b) did not apply but ruled that Agent Turbeville's testimony was inadmissible because knowledge that DNA could be recovered from a victim's body was not unique to the Defendant and there was a significant danger that the jury would speculate about the Defendant's having committed prior crimes. However, the trial court warned that it would revisit the issue "if the door [was] opened one way or the other at a later point."

At the start of the penultimate day of the trial, the State raised this issue again. The State argued that the Defendant opened the door for Agent Turbeville's testimony by questioning Sgt. Montgomery about the fact that the Defendant had the victim's phone number stored in his phone and the possibility that the Defendant accidently called the victim in the early morning hours of November 10, 2012.[7] The State then said that it intended to introduce a download from the Defendant's phone to show that he had the victim's phone number listed not under the name "Dana," but under the name "Dinae." The State argued that "Dinae" was close to the name of the victim in the Defendant's 2006 murder trial, Dinah Burney.

The State argued that the use of the name "Dinae" in the Defendant's phone coupled with Agent Turbeville's testimony showed that the Defendant not only "was paying attention to the testimony of [Agent] Turbeville, not just that he heard it, but that he took that information and he assigned it to the victim in this case, a victim whose head and hands [were] subsequently removed." Completing its circular argument, the State then claimed that the probative value of Agent Turbeville's testimony was "greatly increased" because it provided "a sufficient explanation" for the misspelling of the victim's name in the Defendant's phone. Defense counsel argued that the use of "Dinae" was nothing more than a simple misspelling.

The trial court stated that Dana was "an easy name to spell" and that the Defendant knew how to pronounce the victim's name; therefore, Dinae was not just a misspelling of Dana. The trial court then stated that "there could be an argument that the [D]efendant perhaps associated [Dinae] with testimony that he heard previously related to a Dinah in which evidence was recovered from [the] head and hands" and that this gave Agent Turbeville's testimony more probative value. The trial court ruled that it would allow Agent Turbeville to testify because the victim's phone number was listed under "the same name [as] the person about whom [Agent] Turbeville testified, and about who[m] [the Defendant] was present and heard the testimony."

---

[7] The Defendant himself had made this claim in his interview with Det. Parks and Sgt. Montgomery.

Immediately following Agent Turbeville's testimony, the trial court held a bench conference during which it said that it had observed the jury during the testimony and that it was not sure "whether they got it or not." The trial court stated that it would not give a limiting instruction because it did not think "that [the] evidence had the effect that the [c]ourt or the defense or maybe even the State anticipated from the standpoint of impact." Defense counsel agreed with the trial court's decision, stating that he "didn't see any effect of it either." The trial court reiterated that it would not give a limiting instruction on Agent Turbeville's testimony, and defense counsel maintained that he did not want such an instruction immediately before the parties began their closing arguments.

After discussing the Defendant's having bleached his shoes during the State's initial closing argument, the prosecutor made the following statement:

> What other evidence has [the Defendant] destroyed? And that brings us to the most unusual, the most unique fact about this case. What other evidence has been destroyed? Well, Dana's hands have been removed, and Dana's head has been removed. And when you think about that fact, when you think about that unique and unusual fact, I want you to think of one name: Dinah Burney.
>
> You heard [Agent] Turbeville testify Saturday about Dinah Burney. He testified at a judicial proceeding. He testified that there was DNA evidence recovered from the fingernails of Dinah Burney, that there was DNA evidence recovered from the mouth or the head of Dinah Burney, and that he was able to match that with an individual. And who was present for that proceeding? The [D]efendant. So he knows that DNA evidence, that incriminating evidence can be recovered from the head and the hands of a subject. He knows that. That gives him particular incentive to remove Dana Wilkes's head and hands.
>
> So when you think of why does Dana not have [her] head or hands, I want you to think of one name. I want you to think of Dinah Burney.

Later, the prosecutor referred to the Defendant as "the guy who knows that evidence can be recovered from the head and hands of a subject."

Immediately following the State's initial closing argument, the trial court sua sponte instructed the jury as follows:

> Members of the jury, evidence has been presented that the [D]efendant was present at a prior judicial proceeding related to Dinah Burney. That

-30-

evidence has been offered to establish that the [D]efendant had knowledge of something. You should not consider that evidence for any other purpose. You should not speculate about the purpose of the judicial proceedings or about why the [D]efendant was present, nor should you infer anything negative against the [D]efendant other than that the State avers that he had knowledge.

During his closing argument, defense counsel said that the State wanted the jury to believe that the Defendant had "some kind of specialized knowledge about DNA" when he did not and that recovery of DNA from a body was "common knowledge." During the State's rebuttal, the prosecutor made the following statement about the victim's phone number as it was stored in the Defendant's phone:

You notice the name? Y'all, that's not Dana. That's very, very close to Dinah. Do you remember who Dinah is? Dinah is the name of the woman that [the Defendant] heard [Agent] Turbeville testify about. Dinah is the woman who had her oral swab taken and had DNA there. Dinah is the name of the woman that had DNA under her fingernails. That's the name [the Defendant] has associated with Dana's telephone number, who turns up, after last seeing the [D]efendant, last communicating with the [D]efendant, with her head, her mouth, and her hand, her fingernails, missing.[8]

The prosecutor continued, stating as follows:

[Defense counsel] tells you it would take a monster. He's right. It would take a monster to assign [Dinah Burney's] contact information to Dana Wilkes's telephone number. What this provides to you is a a rare glimpse into the mind of [the Defendant], and it's frightening. It's appalling, it's disturbing, and it's downright scary.

Just before the end of the prosecutor's closing argument, he discussed the fact that the Defendant did not call the victim when he heard that she was missing. The prosecutor made the following statement:

[The Defendant] doesn't need to check up with [the victim]. He knows exactly where her little body is. He knows she's laying [sic] over there on the bank of Youngstown Road with her head gone and her hands gone, so

---

[8] In its brief, the State asserts that this statement "was the only mention of Agent Turbeville's testimony during rebuttal." The record belies that assertion.

-31-

no evidence could be recovered the way [Agent] Turbeville recovered it from Dinah Burney.

The prosecutor continued, telling the jury that if they needed "some glimpse into what [the Defendant] was thinking about" they had that in the victim's "telephone number [being] associated with the other woman" and that should give the jury "insight into the mind of a guilty man." The jury deliberated for several hours. During that time, the jury sent a note to the trial court asking for a transcript of Agent Turbeville's testimony.

## *2. Rule 404(b)*

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). This rule "is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citing Anderson v. State, 56 S.W.2d 731 (Tenn. 1933)). The danger of a jury improperly convicting a defendant based on their character rather than the evidence presented at trial "particularly exists when the conduct or acts are similar to the crimes on trial." Id. (citing State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985)).

Rule 404(b) requires the trial court to hold a jury-out hearing regarding the admissibility of specific instances of conduct "upon request." The State argues that Rule 404(b) is not applicable in this case because the Defendant "did not request a 404(b) hearing as required by the rule." We do not find this argument persuasive. The State sought to admit this evidence, and the Defendant timely objected to it. Rule 404(b) does not specify that a certain party must request the hearing, only that the trial court must hold a hearing "upon request." At the State's request, a pretrial hearing was held on this matter. When the State sought to introduce the evidence again during the trial, a lengthy jury-out hearing was also held. Furthermore, the State argued to the trial court that Rule 404(b) was not applicable. The trial court accepted the State's argument and analyzed the issue as argued by the State. As such, we reject the State's argument that the Defendant is procedurally barred from arguing that the trial court erred by not applying Rule 404(b) to this matter.

Another prerequisite to the admission of evidence under Rule 404(b) is clear and convincing proof of the other bad act. Tenn. R. Evid. 404(b)(3). With respect to acquittals, Tennessee follows the minority rule that "a crime for which the defendant was acquitted can never be admissible as evidence of a prior crime in a trial, despite its relevance on issues other than propensity" because "an acquittal precludes the possibility

-32-

of an inference that the defendant committed the crime."[9] State v. Shropshire, 45 S.W.3d 64, 76 (Tenn. Crim. App. 2000). As such, any testimony about the Defendant's alleged role in the murder of Dinah Burney and his subsequent acquittal would be inadmissible regardless of whether it was relevant to an issue other than propensity.

The State argues that Agent Turbeville's testimony was "not about a prior bad act of the [D]efendant" but was rather about his "previous testimony" and recollection that the Defendant heard that testimony. In State v. Fleece, this court held that the prosecutor's presentation of evidence that the defendant had a restricted license when the defendant was not charged with driving while his license was restricted "gave rise to the impermissible inference that [the defendant] had a previous [driving under the influence] conviction." 925 S.W.2d 558, 561 (Tenn. Crim. App. 1995). This was especially true in light of the fact that the prosecutor repeatedly mentioned that the defendant's license had been restricted by a judge and waved "the [defendant's] jacket from his prior DUI case" in front of the jury. Id. at 560.

While not directly referencing the Defendant's prior murder charge and trial, Agent Turbeville's testimony created an impermissible inference of those matters. Agent Turbeville told the jury that he testified at a "judicial proceeding" in 2006 about how he recovered DNA from Dinah Burney's mouth and fingernails and matched it to an individual. Agent Turbeville also stated that he recalled the Defendant being present during his testimony. The Defendant having been on trial in a previous matter is the only plausible inference the jury could draw from the fact that Agent Turbeville, a seventeen-year veteran of the TBI and head of the TBI's forensic biology unit, could recall that the Defendant was present when he testified at a "judicial proceeding" some six years before this trial. Moreover, this inference was bolstered by the State's argument that hearing Agent Turbeville's testimony gave the Defendant a "particular incentive to remove [the victim's] head and hands."

Agent Turbeville's testimony also created an inference that whatever the Defendant was previously on trial for, it was a serious offense. The jury had heard lengthy testimony about the recovery of blood and DNA analysis in this case. Then the jury heard that Agent Turbeville recovered DNA from Dinah Burney's mouth and fingernails in order to match it to another individual. The State argued to the jury that the Defendant was "a monster" for associating the victim's phone number with Dinah

---

[9] If the acquittal was based on something other than insufficient evidence, then evidence of the other crime may be admissible under Rule 404(b). See State v. Holman, 611 S.W.2d 411, 413 (Tenn. 1981). However, that is not the case here. The Defendant's trial counsel from his 2006 murder trial testified during the jury-out hearing that the Defendant's DNA was found in Dinah Burney's mouth and underneath her fingernails but that DNA from an unknown person was found in her vagina and the jury viewed that as creating reasonable doubt of the Defendant's guilt.

Burney and that his doing so was "frightening," "appalling," "disturbing," and "downright scary." This could only leave the jury with the inference that something horrendous had occurred to Dinah Burney and that the Defendant had, at the very least, been tried for it. Cf. State v. Leath, 461 S.W.3d 73, 100 (Tenn. Crim. App. 2013) (holding that a witness' testimony that she had previously stated that she was "scared" of the defendant was not Rule 404(b) evidence because it referred only to "some possible, undefined prior bad act").

Furthermore, another prerequisite to the admission of Rule 404(b) evidence is that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(4). Agent Turbeville's testimony had very little probative value given that it "is fairly common knowledge that DNA is prevalent; it is microscopic." State v. Armstrong, 993 N.E.2d 836, 840 (Ohio Ct. App. 2013). Nor do we find persuasive the State's argument that the listing of the victim's phone number in the Defendant's phone under "Dinae" was a reference to Dinah Burney. Throughout his interviews with the investigators as play for the jury, the Defendant incorrectly pronounced the victim's name. Additionally, there were numerous other misspellings found in the exhibited list of contacts downloaded from the Defendant's phone. This slight probative value was significantly outweighed by the danger of unfair prejudice created by Agent Turberville's testimony regarding the Defendant's 2006 murder trial. Accordingly, Agent Turberville's testimony was impermissible Rule 404(b) evidence that should not have been admitted at trial.

Nor do we believe this error to be harmless. The Tennessee Rules of Appellate Procedure provide for harmless error review. See Tenn. R. App. P. 36(b). Errors in the admission of evidence are typically considered non-constitutional. State v. Rodriguez, 254 S.W.3d 361, 375 (Tenn. 2008). As such, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Id. at 372 (quoting Tenn. R. App. 36(b)). "Errors in admitting evidence are less likely to be harmless in close cases." Id. at 376 (citing Blankenship v. State, 410 S.W.2d 159, 161 (Tenn. 1966)).

While the jury might not have initially viewed Agent Turbeville's testimony as significant, that changed after the State's closing argument. Immediately prior to the State's closing argument, the trial court stated that it would not provide a limiting instruction on Agent Turbeville's testimony. Immediately following that argument, the trial court felt compelled to sua sponte provide a limiting instruction to the jury. Additionally, the jury requested a transcript of Agent Turbeville's testimony during their deliberations. Furthermore, the State's case against the Defendant, as we will discuss in detail below, was largely circumstantial. As such, we conclude that the inclusion of

-34-

Agent Turbeville's testimony more probably than not affected the judgment and was not harmless, necessitating reversal of the Defendant's convictions and a new trial.

### C. Evidence Seized From Warrantless Search of the Defendant's Cell Phone

The Defendant contends that the trial court erred in admitting evidence found as a result of a warrantless search of the Defendant's cell phone. To support his argument, the Defendant cites <u>Riley v. California</u>, __ U.S. __, 134 S. Ct. 2473 (2014), which was decided after the Defendant's trial. The State responds that the Defendant has waived this issue because he did not file a pretrial motion to suppress the evidence.[10] However, we decline to address this constitutional question because it can be resolved on non-constitutional grounds.

Tennessee courts "do not decide constitutional questions unless resolution is absolutely necessary for determination of the case and the rights of the parties" and should avoid deciding constitutional issues "[i]f [the] issues in a case can be resolved on non-constitutional grounds." <u>State v. Thompson</u>, 151 S.W.3d 434, 442 (Tenn. 2004) (quoting <u>Owens v. State</u>, 908 S.W.2d 923, 926 (Tenn. 1995)).

Here, the only evidence taken from the Defendant's phone and used at trial was an "extraction report" listing the Defendant's contacts along with other files contained on his phone.[11] The report was used solely to link the Defendant to Agent Turbeville's testimony regarding Dinah Burney. Having concluded that Agent Turbeville's testimony was impermissible Rule 404(b) evidence, we now conclude that the "extraction report" was not relevant; therefore, it was not admissible. <u>See</u> Tenn. R. Evid. 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that <u>is of consequence to the determination of the action</u> more probable or less probable than it would be without the evidence") (emphasis added); Tenn. R. Evid. 402 (stating that evidence "which is not relevant is not admissible").

### II. Defendant's Remaining Issues

### A. Venue

The Defendant contends that the State failed to prove venue by a preponderance of the evidence. The Defendant's argument regarding this issue is scant and rests solely on the fact that Det. Montgomery testified that "he could not say where the victim was

---

[10] While not raised pretrial, the Defendant did object, on different grounds, to the admission of this evidence when the State sought to introduce it at trial.

[11] Mr. Hamilton's testimony regarding the locations of the Defendant, the victim, and Mr. Wilkes's cell phones was based upon information obtained from their cell phone providers.

murdered because he did not know." The State responds that it proved by a preponderance of the evidence that the offenses occurred in Hamilton County.

The Tennessee Constitution "provides that an accused must be tried in the county in which the crime was committed." State v. Young, 196 S.W.3d 85, 101 (Tenn. 2006) (citing Tenn. Const. art. I, § 9). Therefore, "[p]roof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." Id. (quoting State v. Hutcherson, 790 S.W.2d 532, 535 (Tenn. 1990)). "Slight evidence is enough to carry the prosecution's burden of proof if such evidence is uncontradicted" and "this evidence may be either direct, circumstantial, or both." State v. Ellis, 89 S.W.3d 584, 598 (Tenn. Crim. App. 2000). In murder cases, there is a rebuttable presumption "that the crime was committed where the body was found." Reynolds v. State, 287 S.W.2d 15, 16 (Tenn. 1956).

Here, the victim was last seen in Hamilton County. Her Jeep, with her blood inside, was found in Hamilton County. The victim's cell phone records from the day of her disappearance and the next day showed that her cell phone connected to cell towers in Hamilton County for all of her phone calls. The victim's body was ultimately discovered in Hamilton County. No evidence was presented at trial to suggest that the murder of the victim and dismemberment of her corpse occurred anywhere other than Hamilton County. Accordingly, we conclude that the State proved venue by a preponderance of the evidence and that this issue is without merit.

## B. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. After a one paragraph statement on the standard of review for sufficiency of the evidence claims, the Defendant's argument, in total, is as follows:

> Here, there was testimony that [the Defendant] was at home with Ms. Morris at 10 or 11 p.m. on November 9, and was there when she woke up the next morning. During this time frame, [the victim] made a call to another person, trying to sell him narcotics.

> There were no eyewitnesses to the crime. The location and time frame of her murder were unknown. [The victim] could have been murdered anytime between November 9 and November 25, 2012. Because the evidence was insufficient to support conviction this [c]ourt should grant the [D]efendant's motion for judgment of acquittal and for new trial.

The State responds that the evidence was sufficient to sustain the Defendant's convictions.

-36-

At the outset, we note that given the length, complexity, and serious nature of this case, the Defendant's argument regarding this issue borders on the inadequate and risks waiver of the issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument . . . will be treated as waived in this court"). Waiver notwithstanding, we will address the sufficiency of the evidence.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted). As applicable here, a person commits abuse of corpse when they, "without legal privilege," knowingly physically mistreat "a corpse in a manner offensive to the sensibilities of an ordinary person." Tenn. Code Ann. § 39-17-312(a)(1).

The evidence at trial, viewed in a light most favorable to the State, established that the Defendant was the last person to be seen with the victim before she disappeared. The Defendant's cellphone records showed that he called the victim's phone in the early morning hours of November 10, 2012, and that his phone and the victim's phone connected to cell phone towers covering a geographic area that was inconsistent with where he told the police he was that night. In fact, the cell phone towers covered the area where the victim's Jeep, with the victim's blood inside, was found. The Defendant never called the victim again after this early morning phone call on November 10th.

The last phone call made from Mr. Wilkes's phone connected to a cell phone tower that covered a geographic area that included the Defendant's aunt's house. Phone calls made from the Defendant's phone later on the morning of November 10, 2012, connected to cell phone towers that were inconsistent with where he told the police he was. The victim's body was found not far from a bait and tackle shop Ms. Morris testified that the Defendant stopped at when he went fishing. Additionally, the Defendant bleached a pair of shoes, the same pair of shoes Ms. Morris told the investigators that the Defendant had worn on November 9th  The Defendant's DNA was found on the victim's bra which was found a short distance from her body. Based upon the foregoing, we conclude that, while mostly circumstantial, the evidence was sufficient for a reasonable jury to find that the Defendant premeditatedly and intentionally killed the victim and severed the head and hands from her body.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed, and this case is remanded to the trial court for a new trial consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE